Our first argued case this morning is number 2249, Nall v. Hartford Life and Accident Insurance Company, Mr. Ellis. Thank you, Troy. Good morning. May I please the court? My name is Hudson Ellis, and I represent the appellant Ashley Nall. We're asking the court to reverse the district court because it's consideration of the subjective nature of my client's claim and the subjective evidence of my client's claim was not appropriate under Second Circuit precedent. I think the best way to frame the issues in this case is to look at the two primary cases that the parties briefed in in their arguments, which are Hobson and Miles, which I think are in their own way on point in this case. Starting with Hobson, I think that Hobson provides an excellent counterpoint to what this case has. Starting with the evidence, the objective evidence at issue in the Hobson case was a, well, MetLife identified the 18 tender point test as an objective test that would show the fibromyalgia diagnosis of Miss Hobson. And they identified this in the denial letter, said, if you can get us this evidence, then we'd consider it. This is something that would help us in considering her claim. She didn't go out and get that evidence in her claim, and they eventually denied her, and that was one of the key points that was the reason why they upheld the denial of MetLife in that case. Here, in contrast, Hartford identified no objective evidence that my client could get that she had not already gotten. In fact, she had already gotten three, really the three gold standard objective tests to prove that she had been near the disease. This isn't based on the absence of evidence, right? I mean, isn't it based on reports from doctors that said that she was safe to return to work, that she could engage in light work and keyboarding and that kind of thing, and only had limitations and so was capable of light work? So it wasn't based on the absence of evidence establishing a disability. It was based on an evaluation of what her condition was, right? So there were two evaluations, one from her treating physician and one from Dr. Zandivar, a physician hired by Hartford in this case. And the basis for her disability, though, is not related to her being able to keyboard or to be able to lift or stand or any of those physical restrictions. It's related to having episodic near symptoms, and that's just classic for that condition. But her own physician, with the exception of his last report, specifically said the laws appearing with regard to the autogram did not interfere with speech discrimination. He found reports did not indicate a disabling condition as a result of these tests. That's SPA-28. So it's her own treating physician says that. It's only at the very end when she's contesting it that he then makes a very summary without any reference to tests conclusion that she's disabled. In fact, she herself characterized herself prior to the denial as being able to do walks, lighthouse work, et cetera, other things like that. Certainly inconsistent with someone who would be disabled, wasn't it? So I think that's exactly where I was going to focus next. Let's just jump right in. Speak right up because this was designed to prevent people from hearing. Okay. Well, I'll speak up. I think those are key points because what Hartford and then also followed by the district court does is it tries to show that there's a conflict between what she's able to do and what is reported that she's able to do and what she says. And that's actually not true. If you look at what Dr. Favreau says, first of all, yes, the audiograms show a deficiency in her audible reception, but they also show 100% word discrimination. But that actually is completely expected from Meniere's disease because the reason you do an audiogram for Meniere's is not to see whether or not you have auditory or word recognition. It's because the reduction in your hearing is consistent with Meniere's. That's a positive finding for Meniere's disease. Whether you can hear words is not the reason why you're disabled from Meniere's. When you have a Meniere's episode, you have vertigo, nausea, and confusion. Right, right. So you're saying that the disability is not that she couldn't distinguish words but that she would have vertigo, right, episodic vertigo. Yes, in part, yes. But the reports here consider that, right? Well, not really because really what they're saying is that they're looking at one part of it. They're saying, well, she reports that she can sit, stand, walk. She can do these activities of the day of living. But what they ignore is the qualifier that she puts in every single one of the reports is when I am not having a Meniere's episode. Well, you're right. The question is whether it's episodic or whether it's so frequent that it renders her disabled or it's episodic, that she has periods of time where she has difficulties but she continues to be able to take care of herself and or continue to work. And the standard is measured on a 180-day window, right? That's the elimination period, yes. But let's talk just for a second before your time runs out. Standard is arbitrary and capricious, correct, because it's a self-administered determination, correct? Yes. All right, and substantial evidence is our review, correct? Yes. So even if we might disagree, as long as there's substantial evidence that supports the determination and it's not arbitrary and capricious, whether we like it or not, that's the end of the matter. Is that correct? That's correct. All right. But what you're looking at— Can I ask this question? Sure. So the Zandafar report summarizes Nal reporting to Dr. Favreau that she had four vertigo spells in a few weeks, each lasting an hour. At least at one appointment she said that. And Zandafar actually says she should be restricted for her own safety because she might undergo vertigo, but concludes that that is not enough, having four spells in a few weeks to render her disabled. Is that just—would you be compelled to conclude that somebody who had that frequency of spells lasting an hour each was disabled and unable to work? And that's a good question because what Zandafar says, though, is not—he does say she's limited from driving and operating heavy machinery. But what he doesn't give credit to is that she would have these episodic spells that would leave her in a bed for a significant part of the day. It's not just being in bed for an hour, but you also have to rest, and that's classic for Meniere's disease. I think what's really telling in this case is that, first, there is no vocational review of whether an episodic, unexpected having to leave work, lay down, or miss work entirely due to a Meniere's disease ever actually would impact her vocationally. Their vocational consultant was entirely just to identify that this was a specific job, and that's it. They never asked her, well, if you have this episodic absence from work, would that preclude you from work? And that's important because that's the entirety of what is keeping her from being able to go back to work. Okay. Thank you, Mr. Ellis. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the athlete, Mr. Benici. Thank you. May it please the court. Greg Benici for the Defendant Appellee, Hartford Life and Accident Insurance Company. I'd like to maybe pick up where my friend left off in terms of the vocational assessment issue that was just raised. That wasn't something that was raised in the briefing, but to clarify that issue, employability and vocational professionals are not qualified to make medical determinations as to restrictions and limitations. So their job is limited to identifying the appropriate vocation or employability based on the restrictions and limitations that are provided. And those restrictions and limitations in this case are provided by Dr. Zandifar. In terms of the absenteeism argument, I think that the bench was on point with the question, are four spells about an hour in duration sufficient to render someone completely and totally disabled? If we look back through the record, one of the things that you'll see, especially in the January to July period, is there's only eight specific days that are identified outside of the intermittent vertigo attacks. So we have about eight days in 140 days of appointments between the first appointment in January and the last appointment in July where a vertigo attack is reported. Most of them are about an hour in length. I believe one was reported as four or five hours. But that's it. And our position is that it's not unreasonable to determine that if someone has on average about an hour vertigo attack, maybe 5% of days over the course of the year, that's not disabling. But your adversary says that that's not the way to look at it, that each episode then involves debilitation while the person is bedridden, et cetera. What's your response to that? That the episodic nature renders them unable to perform. Well, the fact that it's not just a matter of an hour. The argument, if I understood it correctly, is that it's usually debilitation for several hours, if not the whole day. And if that is the argument, that would be something that would be put forward in the administrative record typically. So there would be some evidence related to that. In this case, the evidence related to that came in after the initial denial was provided to the claimant. Within a month period, the claimant went from stating, as Your Honor mentioned, that she could essentially perform daily activities or activities of daily living, with the exception of when a vertigo attack occurred, to stating that she was bedridden. But what doesn't accompany that super-acceleration in symptoms is any increase in the frequency or intensity of treatment. In fact, in her email to Hartford Life, I believe it's on October 5th, when she says she'd like to appeal, she says, I'm going to get a letter from my doctor. She doesn't say, I have more office visit notes coming in. I don't have anything else beyond that. I just have a letter essentially of advocacy from my doctor. And the letter that came in from the doctor actually included a forward-looking statement. This disease can be disabling. It's not saying this disease is disabling with respect to Ms. Nall at this point in time. It's not even saying I'm treating Ms. Nall actively at this point in time. The last time that Dr. Favre— I'm not sure. So if she had more frequent vertigo spells and had to be bedridden more frequently, you're saying that she would necessarily have had more doctor visits as a result of that? Well, there would have been some type of treatment. For example, Dr. Favre said, I essentially don't know why you're complaining of these symptoms. You should see a neurologist. You should get a second opinion from an ear, nose, and throat specialist because he had no more ability to help her in his mind. There was no follow-up appointment even scheduled in his last visit with her in July. She did not follow that recommendation. She didn't see a neurologist. She didn't go to get a second opinion. All he said was reduce your salt intake, try to keep your salt down. In terms of vertigo, maybe it's something that's migraine-related. You should go see a neurologist about that. But there was no seeking of that treatment. So essentially we have a record here where we do have the subjective complaints. They were considered. They were compared to the objective evidence. You are saying that actually it is based in part on an absence of evidence. So if she had more documentation that her vertigo spells were more frequent or that she had sought out the treatment from a neurologist or a second audiologist, then maybe the decision would have been different. Not just the absence of evidence. That's part of it. The treatment that was recommended was not sought, and she was not receiving any other treatment after receiving the gentanasin perfusions. She receives those about every 18 months. And fortunately it seems like they work. So part of it is the absence of the follow-up treatment that's recommended or any pattern or ongoing treatment to address the condition. But the other part of it is the office visit notes that rebut the opinion of a provider. So if a provider says in August or October 2019 she can't work, then Hobson says it allows the administrator to look back at the medical records and say, okay, what do the medical records say relatively? Right. So you're saying that if you look at the medical records, it doesn't support the idea that she is disabled or bedridden all day because there's only infrequent vertigo spells. But if in September she had submitted additional treatment notes where the doctor had said she now reports being bedridden because of more frequent vertigo spells that put her in bed for five hours a day, then the result might have been different. It could have been different. It may have. It's not that it would have been fixed as this is a predetermined result. But as the bench recognized, like with the audiogram testing, for example, that was testing that's done to confirm the diagnosis. But it's well established under Constantinar and other cases in this circuit that disability and diagnosis aren't one and the same. It's the functionality of a claimant that's assessed under a disability, whereas a diagnosis such as audiogram testing, yes, that can show that she has Meniere's disease. But it also does not show that she has a hearing loss as a result of it. So yes, she has the diagnosis. No, at least with respect to hearing in that respect, there's not a functional impairment related to it. In terms of questions about deferring… That's actually… The reason for that is because the request, the referral form that went to Dr. Zandafar, this is at A746. It asked for Dr. Zandafar to opine on her functionality from May 27th through present. And the reason that the May 27th date is important is because short-term disability benefits were paid through May 26th. And so there's no dispute about that initial period of time, January 2nd to May 26th. He was asked to opine on functionality from May 27th forward, and that's why he did it. And with those records, they all show abnormal gait. So the short response is he was… It doesn't necessarily show abnormal gait. It's just that he commented on the abnormal gait before that time period and then doesn't comment on it later, right? No abnormal gait is reported. Right, yeah. That's a fair way to say it, yes. But, I mean, is there reason to believe that if he had observed an abnormal gait in January 2019, it would have resolved? It would have resulted in an award of benefits? No, no. If he had observed an abnormal gait at the beginning of that period, why wouldn't you assume that it continued because her condition did not resolve? Well, she did undergo the Gentamastin treatment. And between the Gentamastin treatments, there was one period after the second of three perfusions where she reported no vertigo. Then she reported some symptoms after the third one. He tried her on a steroid pack and said, call back and let me know how it goes. And then we're in July where the initial denial comes in, and that's when things start to accelerate with the complaints about being bedridden. And then after that, there are no records from Dr. Favreau, no records from any treatment during the appeal period or anything like that. So, you know, it's the absence of clinical documentation, but it's also what was clinically documented relative to the subjective complaints and how the subjective complaints are not corroborated by the clinical documentation. And Miles, which Ms. Nall cites a lot, is a good example of a comparison between that. And Miles was, I believe, the head of the real estate practice group at Venable. He thought he was having a stroke. He goes to the ER. They discharge him. He goes to his internist. The internist says, immediately, you need to go to a neurologist, which Ms. Nall did not do. He goes to the neurologist. The neurologist sets him up with a bunch of drugs and some vestibular therapy treatment to try and get things under control. None of that happened here. We just had an ordinary appointment for ordinary perfusions, which happened every 18 months. She received them. The claim was denied. She went back and asked her provider for a letter. And that's really the basis of the appeal. Okay. Thank you very much, Mr. Vinici. We'll turn back to Mr. Ellis on the phone. Your Honor, I want to get back really quick to what defendant terms as a super acceleration of my client's symptoms. And, again, they're trying to show that there's some sort of conflict between her reports. But what you see in the record is that she very clearly distinguishes when I'm having an episode of Meniere's versus when I'm not. And she's clearly able to do whatever she wants to when she's not having the Meniere's episode. But that's true of Meniere's. You are either having an episode. But the way that she reports the frequency of the episodes earlier on is not consistent with being incapacitated all day, right? So four episodes in a few weeks lasting an hour each suggests that you generally are fully functional, right? And so you would only be bedridden or incapacitated if they were much more frequent than that, wouldn't you? Well, incapacitated when you're having the episode doesn't mean it doesn't talk about the frequency at all. There is a progression in her symptoms, and that's actually documented in the medical records, which shows that she originally just had single-ear Meniere's disease, but then it turns into bilateral Meniere's disease around July of 2019. So there is an expected progression at that point in time. And so you do see a little bit of heightened symptoms at that point. But there's not this super acceleration. It was always episodic. It was always when she was having an episode. And so they're completely consistent, her reports, as well as Dr. Fabreau's reports. The other thing I want to highlight, Your Honor, is the absence of follow-up. I think that that is – I find that very questionable when an insurance company who somebody loses their job and then they refuse to pay the benefits under the policy and they have no income whatsoever is calling into question a claimant for not being able to go and get neurology appointments and not going and get significantly expensive appointments when they have no income and no money whatsoever. And so every time I hear that, it's a very, very jarring comment. Well, that may be the inequities of how the system is set up, but that would require us to read significantly between the lines, wouldn't it? Well, it's just a comment, I guess, on the inequities. But outside of that, as far as that – I mean, is that – are you saying that's the reason she didn't get the follow-up appointment with the neurologist or the audiologist is because of cost considerations? Well, I think there's a couple of reasons that are in the record. One is that the record actually shows that the headaches were not tied to the Meniere's episodes. They specifically said in one of the records the headaches are not related to the Meniere's episodes. And so she's having these two things in tandem, but one's quite a bit more debilitating than the other, so she's focusing on the one that's more debilitating. But outside of that, the report by Dr. Zandafar that there's no gait abnormalities, while one of the things that we think shows that he wasn't being thorough, perhaps the more jarring issue that he had was that he reported there's no remarkable findings – and I'm sorry, I'm out of time – on the audiogram. But he doesn't talk about the VNG testing or the vestibular automatic response testing that she had, both of which had significant abnormal findings, and also that the audiogram was an abnormal finding itself. So it's a misreport. But him saying unremarkable doesn't necessarily mean that there are no abnormal findings. He just might be saying it's not so abnormal as to lead to a disability, right? It's not inconsistent to say it's unremarkable, but it could still be outside normal parameters. Well, if that was the point of the test, I think that would be true. But the whole point of that test is not to see if there's speech discrimination. It's whether or not there is a reduction in her auditory capacity. And in the abnormality of it, that is the whole point of it. It was to confirm. And there is no test for Meniere's disease to show the severity. It is entirely to diagnose it, and then after the diagnosis, it is entirely subjective. And so this is very similar to the Myles case, where that was a vertigo. She underwent all of the objective testing, and the objective testing showed the diagnosis, and then the subjective symptoms were reported by the treating physician. Okay, thank you very much, Mr. Ellis. The case is submitted. Thank you all.